IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:07-HC-2032-FL

| | |
|---|---|
| UNITED STATES OF AMERICA | **RESPONDENT'S PROPOSED** |
| vs. | **FINDINGS OF FACT AND** |
| | **CONCLUSIONS OF LAW** |
| MIKEL BOLANDER | |
| Respondent. | |

NOW COMES, the Respondent, MIKEL JAMES BOLANDER, by and through his assigned panel attorney, and respectfully requests that this Honorable Court make and enter the following "Findings of Fact and Conclusions of Law" in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**I.  INTRODUCTION**

1.    Petitioner (the "Government") initiated this civil action on February 9, 2007, seeking to commit Mikel James Bolander ("Mr. Bolander" or "Respondent") as a "sexually dangerous person" pursuant to the Adam Walsh Protection and Safety Act of 2006 (the "Act" or "§ 4248"), 18 U.S.C. § 4248. [DE 1].  The Government filed a certificate dated February 8, 2007 stating that mental health personnel for the Federal Bureau of Prisons ("BOP") examined Respondent and issued a preliminary determination that Respondent is sexually dangerous with the three prong standards of the Act.  The certificate filed under the Act stays Respondent's release pending the commitment hearing in this case scheduled for the week of January 17, 2011, pending a determination by this Court at a bench trial to determine whether Respondent qualifies as "sexually dangerous person."  The Government filed the certification petition [DE 1] on the date of the Respondent's actual date of scheduled release from BOP and his return to supervised release at California.

2.    The evidentiary hearing and bench trial as to the Respondent's status is set now before Senior United States District Court Judge Bernard A. Friedman during Your Honor's special term January
**THE LAW OFFICES OF W. H. PARAMORE, III, P.C.** - Telephone: (910) 347-1800
110 New Bridge Street, Suite 4, P.O. Box 215, Jacksonville, NC 28540
1

Case 5:07-hc-02032-FL-JG   Document 104   Filed 01/18/12   Page 1 of 20

17-20, 2012.  Consistent with this Court's order, the Proposed Findings of Fact and Conclusions of Law are to be submitted no later than the beginning of the aforementioned hearing.

3. It is the position of the Respondent that after witnesses at the evidentiary hearing, a review of the evidentiary record, and the submission of the parties, this Court should conclude that the Government has not met its burden by proving by clear and convincing evidence that the third prong of the Act has been established and the petition should be denied and the Respondent released.  The Petitioner has failed to prove by the standard of proof "clear and convincing evidence" that the Respondent would have serious difficulty in refraining from sexually violent conduct or child molestation, if released.  The Court bottoms this finding with respect to the third prong of the Act on the following: 1) Respondent's pattern of offending only includes a "hand's on conviction" over 22 years ago (his only actual offense of a direct sexual nature) and has resolved to child pornographic offenses (which are not the focus of the Act); 2) Respondent is now age 48, has no libido, has not had deviant fantasies in over seven years, has not had an erection in over five years, and has no sexual interest of any type at this time; 3) Respondent has served the last eleven years consecutively in prison and during that time has, by self-help and self-education, developed "victim empathy" and adult relationships such that he is not the same person, but a much safer person, in terms of not having any potential to reoffend with children; 4) Respondent has accepted full responsibility for all his criminal activity and expressed genuine remorse for the pain and hurt that he caused the victim in 1988.  Despite the evidence offered by the Government, the weight of the evidence is not clear and convincing that Respondent does not have volitional control in regards to another "hands offense" and the Court, specifically, finds Respondent should be released to probation and supervised release.

II. **FACTS**

4. Mike Bolander is now 48 at the time of this hearing; his date of birth is January 19, 1964.

5. At the time of this hearing Mr. Bolander since age 25, has been incarcerated for 18 of the

**THE LAW OFFICES OF W. H. PARAMORE, III, P.C.** - Telephone: (910) 347-1800
410 New Bridge Street, Suite 4, P. O. Box 215, Jacksonville, NC 28540
2

Case 5:07-hc-02032-FL-JG   Document 104   Filed 01/18/12   Page 2 of 20

past twenty-three years; continuously since 2001 (a period of over ten years; he has been detained on the Certification [DE 1] for close to five years.)

6. Respondent was to be released and discharged from FCI Butner on February 9, 2007 and returned to the supervised release with intense supervision at California.

**A. Personal History**

7. Mr. Bolander was born in Minnesota and raised at Minneapolis. His family was intact and he has a younger sibling who died in 2005. There is no history of physical or sexual abuse reported but there was some history (maybe limited) of verbal abuse or arguing with his parents. His relationship with his mother and father was not extremely affectionate, but Respondent knew that his parents did, indeed, love him. All his basic needs were met. His parents divorced when Respondent was 16; his mother and stepfather now reside in Kingman, Arizona and his father is in Minnesota.

8. Mr. Bolander did not graduate from high school with his class, but did secure his GED. Since age 5, he had been fascinated with the United States Navy and joined, was trained as a data processing technician, and served on the USS Carl Vinson. Respondent did receive an Honorable Discharge from the United States Navy.

9. While in the Navy, his locker was inspected and a binder with cutout photos of young boys was found. It should be noted, there was no child pornographic material in the locker and he was not prosecuted by the United States Navy but discharged to a "land position" before the end of his contract with the Navy.

10. Respondent worked for three years at Frazee Industries as a computer programmer after service in the Navy. Respondent has a consistent history of employment when not incarcerated except during the short period when he was laid off because of work attrition.

11. In 1998, Respondent developed a relationship with a young male, under the age of fourteen (11 years of age). In effect, as Respondent later learned in SOTP, he groomed this young male for sexual

activity. Respondent had several sexual acts with the young male including him performing oral sex on the young male, attempted to perform anal sex with the juvenile, and making an audio of sexual activity. Respondent was arrested in 1998 and convicted by plea of guilty on February 15, 1989 of committing a lewd act with a child under age 14; a 72 month sentence was imposed (he served 36 months of this sentence in the California penal system). This is the Respondent's sole conviction of a "hands on offense"; there was one child involved and he admits responsibility completely for what happened - that he was the adult and he should have prevented the offense. After this conviction, Respondent made a commitment to himself to not ever reoffend by actual touching a child. He has not.

12. Subsequently, Respondent became involved in child pornography; he had eschewed actual touching and physical offenses. In November of 1996, Respondent received his first conviction involving child pornography in federal court and received a 37 months term of imprisonment.

13. On October 22, 2009, Respondent pled guilty to distribution to a co-defendant in the State of New York of child pornography and was sentenced to a 12 months of imprisonment with credit for time served and supervised release.

14. At a supervised release violation hearing on February 7, 2002, Respondent was found to be in violation of the prior child pornography convictions and sentenced to a 60 month term of imprisonment.

15. In cases which were heard on February 11, 2002, Respondent received additional imprisonment for 37 months time consecutive to the 60 month term in the preceding paragraph–which led to the release and discharge date for Respondent of February 9, 2007.

16. While released from prison, he has always worked and served as an excellent employee. Mr. Bolander's work skills are exemplary; he is highly skilled in computer programming.

**B. Sex Offender Treatment**

17. While serving the initial sentence in the State of California, Respondent sought out

treatment. He was sent to Atascadero State Hospital and did complete the experimental program that was in place there – in treatment he sought victim empathy and change in his personality so that he may develop adult interpersonal relationships. While at this facility, Respondent ordered with his own funds adult pornographic materials as directed; the directors of the facility wanted to remove certain images from the pornographic magazines. As an act of anger, Respondent removed "child pornographic material' which he inadvertently found at this facility. This was returned after, as he admits, he viewed the material. Respondent did complete the program but, despite the professionalism of the program at Atascadero, Respondent did not believe that there was a significant increase in his victim empathy feelings for his child victim and increase in his attraction to adults. These were the issues that encouraged him to seek treatment while in the California penal system and later in the BOP.

18. While in federal custody, Respondent made application and was transferred to FCI-Butner at the SOTP program. Respondent never completed the program and a statement attributed to him while in SOTP treatment that "if he could legally have sexual activity with young boys, he would repeat that conduct" has plagued him. Respondent was asked this question at the inception of the program in what he believed was a hypothetical method. When he signed the statement of confidentiality, Respondent believed the questions were confidential and protected by his privilege. He made whatever statement was attributed to him having no concept that 13 years later in a civil commitment proceeding this statement would be used against him. Respondent was subsequently discharged from the program.

19. Throughout his period of incarceration, to include while on parole and/or supervised release and, most importantly, since his incarceration in BOP since 2001, Respondent has engaged in "self-help." He has read books and articles and developed feelings about victim empathy and now feels hurt and angry at himself for any pain or problem that he ever caused the young man that he touched in California, twenty-three years ago. Respondent's view about sex between adults and child are now congruent with the view of morality as shared in our country. He is 48 years of age; he no interest in sexual activity; he has not had

**THE LAW OFFICES OF W. H. PARAMORE, III, P.C.** - Telephone: (910) 347-1800
410 New Bridge Street, Suite 4, P. O. Box 215, Jacksonville, NC 28540
5

Case 5:07-hc-02032-FL-JG  Document 104  Filed 01/18/12  Page 5 of 20

an erection in four or five years; he has never had child or any other pornographic material found during any shakedown of any locker or areas that he controls and he has very strong feelings that he will not reoffend. His focus is on restoring his relationship with his parents, particularly his mother, and establishing relationships with other adults.

21. Respondent's current legal status is that he is still subject to supervised release from San Diego, California and would be subject to all the registration, restrictions on contact with children and computers, and other standard conditions imposed in a federal judgment.

### III. EXPERT'S QUALIFICATIONS

22. Dr. Lela Demby, an employee of the Government, will be called as an expert in this case; she has reviewed the records pertaining to Respondent; she has never interviewed the Respondent. Dr. Demby has rendered two separate reports which the Government has submitted in discovery.

23. The Government retained the services of Dr. Christopher North of California as a psychologist, in private practice, prior to the filing of his first report; Dr. North was never appointed as an expert until the entry of a *sua sponte* order by the United States Magistrate [DE 64]. Dr. North submitted two reports – the second an update of the first after an interview of Respondent. [DE 74].

24. Respondent retained the services of Dr. John Frank Warren of North Carolina; Dr. Warren was appointed on motion of the Respondent [DE 53]; Dr. Warren reviewed the discovery, interviewed the Respondent, and filed a report.

25. The Government and the Respondent do not challenge the qualifications of the three experts identified above. The Court, having reviewed the curriculum *vitae* of each expert, finds that each individual is qualified by education and experience to offer expert testimony consistent with Rule 702 of the Federal Rules of Evidence. The Respondent has lodged an objection, duly noted in the Pretrial Order, concerning the testimony of Dr. Andres Hernandez as a "lay witness" for the Government. Respondent was first given notice of the Government's intention to call Dr. Hernandez as a witness on January 15,

2012 and Respondent has not deposed Dr. Hernandez. Dr. Hernandez is the Director of the SOTP program at FCI Butner and has served in the capacity for at least fourteen years, making it nearly impossible to separate his credibility as a lay witness from his status as Director of the SOTP program (a position which, by its name, carries the weight of an expert witness) and in light of the fact that the forecast of his testimony is redundant of other testimony on the same issue offered by the Government, this Court finds that Dr. Hernandez can either testify as an expert witness and be subject to deposition or not testify during this hearing.

## IV. LEGAL ISSUES

26. In presenting these issues to the Court in this document, Respondent is cognizant of the fact that in a series of Orders entered by this Court and in proceedings instituted and heard under the Act, the Government has been successful in the Eastern District of North Carolina on the issues discussed below and that in a very recent decision announced in the United States Court of Appeals for the Fourth Circuit, the gravamen of these issues have been resolved against Respondent. *United States v. Timms,* Nos. 11-6886 and 6941, ___ F.3d _____ (4th Cir. January 9, 2012). These issues are included at this juncture for preservation of the record.

### A. Section 4248 violates Equal Protection under the Federal Law

27. This Court finds at the outset that § 4248 deprives Respondent of equal protection under the law and violated the Fourteenth and Fifth Amendments; there is no rational basis for § 4248 making a distinction and unconstitutional differentiation between individuals in BOP custody and individuals in the public at large.

### B. Delay in the Proceedings Violated Respondent's Due Process Rights

28. Respondent received his notice of certification on February 9, 2007, just short of five years back. Respondent has been deprived his due process rights under the Fifth Amendment of the United States Constitution in two separate methods–first, by not bringing the civil commitment hearing before his

**THE LAW OFFICES OF W. H. PARAMORE, III, P.C.** - Telephone: (910) 347-1800
410 New Bridge Street, Suite 4, P. O. Box 215, Jacksonville, NC 28540

Case 5:07-hc-02032-FL-JG Document 104 Filed 01/18/12 Page 7 of 20

release and discharge on February 9, 2007 and not conducting his civil commitment hearing within a reasonable time after the certification seeking commitment as a sexually dangerous person was filed.

### C. § 4248 as applied to Respondent Constitutes Criminal Punishment

29. This Court finds that the civil conditions of Respondent's confinement constitute clear criminal punishment which vitiates the Double Jeopardy Clause, the *Ex Post Facto Clause*, the Eighth Amendment prohibition against cruel and unusual punishment and the Respondent's right to a jury trial under the Sixth Amendment. The Respondent's statutory rights as an accused as protected under Title 18 of the United States Code–initial appearance, notice of maximum and minimum sentence, detention hearing, right to retain counsel, preliminary hearing (in part)--have been abridged as well.

### D. Violation of Right to Privacy and *Jaffee v. Richmond*

30. The Government without notice or any due process provided to Dr. Christopher North confidential information and disclosures protected by the confidentiality agreement that Respondent signed when entering the SOTP program at FCI-Butner, notes from other treatment and evaluations including Atascadero Hospital, Dr. Larry Corrigan, and Dr. Wistair MacLauren. These items included information supplied by Respondent during the treatment and provision of confidential psychological services by the BOP and pursuant to privileges regarding therapist-patient communication protected by California law. This information is protected by the decision in *Jaffee v. Richmond,* 518 U.S. 1 (1996), and the rights of privacy provided to the Respondent by the First Amendment. The Respondent has challenged the admissibility of this evidence and the opinions of Dr. North derived from this evidence by motions *in limine*. [DE 76].

### E. Standard of Proof and Elements Required to be Established

31. The Government has the burden of proving each element by clear and convincing evidence. 18 U.S.C. § 4248(d). "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but by the Due Process clause

of the Constitution." *Addington v. Texas*, 441 U.S. 418, 427 (1979). The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." *Id.* at 425. "Clear and convincing" has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001) (internal quotations and citations omitted). It has alternatively been described as meaning "highly probable.'" *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1992) (quoting 9 J. Wigmore, Evidence § 2498 (3d ed. 1940)). *See United States v. Revland,* 5:06-HC-2212 (Eastern District of North Carolina, decided December 23, 2011).

32. To commit Respondent, the Government must prove by clear and convincing evidence that Respondent is a "sexually dangerous person," which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

33. This phrase has not been defined by the statute. The legislative history indicates that it is a direct legislative enactment of the principle of volitional impairment enunciated in *Kansas v. Hendricks*, 521 U.S. 346 (1997) and *Kansas v. Crane*, 534 U.S. 407 (2002). *See* H.R. Rep. No. 109-218(I) Section-by-Section Analysis and Discussion § 511. In *Crane*, the Supreme Court stated that the "serious difficulty" requirement is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment, from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another." *Crane*, 413.

34. A finding of dangerousness is also constitutionally required. *Kansas v. Crane*, 534 U.S. 407-09, 410 (stating "we have consistently upheld involuntary commitment statutes . . . [when] (1) the confinement takes place pursuant to proper procedures and evidentiary standards; (2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality'" (*citing Kansas v. Hendricks*, 521 U.S. 346, 357-58; quotations omitted)). See also *Foucha v. Louisana*, 504 U.S. 71, 82-83 (1992).

35. The Court finds that in this regard, the statute and due process considerations require that, in addition to a volitional impairment, the government must prove by clear and convincing evidence that Respondent poses a risk of reoffense that is significant enough to justify a finding that Respondent is sexually dangerous and therefore can be preventively detained.

36. In this case the government has proven neither. The evidence in this case does not demonstrate that Respondent currently suffers from a volitional impairment. The evidence also demonstrates that the recidivism rates proposed by the government's experts are likely overestimates. Further, even if this Court were to credit the government's experts regarding Respondent's likelihood of recidivism, the statistical evidence presented does not rise to the level of clear and convincing evidence of dangerousness sufficient to justify commitment.

### F. Serious Difficulty Refraining from Child Molestation

37. This is the third prong of the Act which the Government must prove in order to commit Respondent and his "disorder" must result in "serious difficult in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). The Act does not clarify whether it is talking about complete release and discharge or release to "supervised release" as Respondent who would be under the supervision of a United States Probation Officer. The Court interprets this mean "release" to speak of release from confinement by the BOP.

38. This third prong of the Act implies a "volitional impairment" as discussed above. This

**THE LAW OFFICES OF W. H. PARAMORE, III, P.C.** - Telephone: (910) 347-1800
410 New Bridge Street, Suite 4, P. O. Box 215, Jacksonville, NC 28540
10
Case 5:07-hc-02032-FL-JG   Document 104   Filed 01/18/12   Page 10 of 20

means that the Government must prove by clear and convincing evidence that Respondent does not have volitional control and this is a separate and independent concept and burden for the Government than the Government just having to prove a "disorder" and the Government cannot rely on the DSM-IV-TR alone.

39. The collective authors of the DSM-IV-TR make it abundantly clear that an individual who has been diagnosed with a mental illness or disorder is not automatically impaired with respect to his or her volition. A disorder and volitional impairment are not one and the same. The manual states and this is relied on by the Respondent's expert, Dr. John Warren, in his report which references this note:

> It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.
>
> The fact that an individual's presentation meets the criteria for DSM diagnoses does not carry any necessary implications regarding the individual's degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one's behavior is a feature of disorder, having the diagnosis in itself does not demonstrate that a particular individual is or was unable to control his or her behavior at a particular time.

Cited from page xxxiii of DSM-IV-TR.

What this means to this Court is that the fact that Respondent has an issue involving pedophilia does not mean that Respondent automatically has a serious issue in controlling this behavior now at age 48, after a lengthy period of incarceration, no longer having the earmarks of being a "loner," maintaining adult interpersonal relationships, and his "hands on offense" occurring over 22 years ago. This is precisely the point of the testimony of Dr. Warren.

40. Based on the Court's analysis of this case, the Government has not shown by clear and convincing evidence that Respondent presents a "mental illness, abnormality, or disorder" that impairs his volitional control such that he would have serious difficulty refraining from sexually violent conduct

**THE LAW OFFICES OF W. H. PARAMORE, III, P.C.** - Telephone: (910) 347-1800
410 New Bridge Street, Suite 4, P. O. Box 215, Jacksonville, NC 28540
11

Case 5:07-hc-02032-FL-JG Document 104 Filed 01/18/12 Page 11 of 20

or child molestation if released to probation for supervised release.

## V. FINDINGS

### A. First Prong of the Act

41. Respondent does not contest the conviction in the State of California in February of 1989 as child molestation under the Act. This Court finds that this conviction has been established by clear and convincing evidence.

### B. Suffers from a Serious Mental Illness, Abnormality, or Disorder

42. The three experts in this case agree that a diagnosis under the DSM-IV-R of "Pedophilia, exclusive to males" is correct. The experts then diverge on other diagnosis which are discussed herein later. Dr. Warren testifies that language used in the Act of "serious mental illness, abnormality, or disorder" is not the language contemplated by the DSM-IV-R and the American Psychological Association and notes in his report a direct quote from the DSM-IV-R section entitled "Use of DSM-IV in forensic settings as follows as quoted from the manual:

> [. . .] Pedophilia (a diagnosis of this condition) does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability [. . .] In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," or "mental defect" [. . .]

Based on his thirty-one years as a psychologists and his status as a psychologist and his status as a national board expert in the field of forensic psychology and his experience from running a sex offender clinic, Dr. Warren is of the opinion that a forensic psychologist cannot, consistent with his training, experience, education, and clinical experience, render an opinion regarding whether the second question in the Act has been satisfied by the information provided in the testimony in this case. Dr. Warren is of concern about the ambiguity and vagueness in the second questions of the Act from the vantage point of forensic psychologists; he sees, base upon his professional experience and training, as this second prong as a question which is a legal conclusion, a mixed question of law and fact for a jurist to decide based on

**THE LAW OFFICES OF W. H. PARAMORE, III, P.C.** - Telephone: (910) 347-1800
410 New Bridge Street, Suite 4, P. O. Box 215, Jacksonville, NC 28540

Case 5:07-hc-02032-FL-JG   Document 104   Filed 01/18/12   Page 12 of 20

12

evidence and not for a psychologist to render an opinion as an expert witness - from the vantage point of Dr. Warren this is a question solely within the province of the jurists. The Government experts disagree; both Dr. Demby and Dr. North have expressed opinions about this, the second question in the Act. Both Dr. Demby and Dr. North testify that "pedophilia, exclusive to males" is the type of mental disorder, though not accurately described by the statutory language which is not drafted consistent with the DSM-IV-TR, does constitute the type of issue that Congress sought to address in the Act. Both Dr. Demby and Dr. North believe that Respondent does suffer from the type of deviance envisioned by Congress but not accurately stated in psychological language in prong two of the statute. The Court finds upon review of the legislative intent of the statute and with reference to prong one of the Act that Dr. Demby and Dr. North should be allowed to give their opinions that the Respondent does indeed suffers from a "mental illness, abnormality, or disorder" as contemplated by this section of the Act. Accordingly, the Court finds the Government has proven by clear and convincing evidence that the Respondent, by reason of diagnosis of "pedophilia, exclusive to males" does suffer from the "mental illness, abnormality, or disorder" contemplated by § 4248.

### C. Serious Difficulty Refraining from Child Molestation

43. As noted above, this third prong of the Act implies a "volitional impairment" as discussed above. This means that the Government must prove by clear and convincing evidence that Respondent does not have volitional control and this is a separate and independent concepts and burden for the Government than the Government just having to prove a "disorder" and the Government cannot rely on the DSM-IV-TR alone.

44. Based on the Court's analysis of this case, the Government has not shown by clear and convincing evidence that Respondent presents a disorder that impairs his volitional control such that he would have serious difficulty refraining from sexually violent conduct or child molestation if released to probation.

**THE LAW OFFICES OF W. H. PARAMORE, III, P.C.** - Telephone: (910) 347-1800
410 New Bridge Street, Suite 4, P. O. Box 215, Jacksonville, NC 28540

Case 5:07-hc-02032-FL-JG   Document 104   Filed 01/18/12   Page 13 of 20

13

## VI. EXPERTS, DIAGNOSTIC IMPRESSIONS, AND RISKS

45. Dr. North submitted two reports - the first dated March 14, 2011 (prior to his meeting with the Respondent on October 5, 2011) and the second, an update, on October 17, 2011. In both reports, Dr. North renders a diagnosis of "pedophilia, exclusive to males." In his first report, he finds evidence of Schizoid traits and seeks to "rule out" Schizoid personality disorder. In his updated report, Dr. North finds only pedophilia and discounts completely Schizoid traits or Schizoid personality disorder. Dr. North finds in his updated report that Respondent is no longer a "loner" and he confirms that in his testimony. Dr. North administered five actuarial tests, the Static-99R, the Static 2002R, MnSOST-R, and SRA-FV (prior to the interview) and the PCL-R and rescored with the SRA-FV (after the interview). The conclusion of Dr. North with respect to the recidivist testing was that Respondent had a moderate to high risk when his scoring compared to the group traits of the preselected offenders in the tests. Dr. North testified that these tests were moderately predictive. Dr. North indicated that it was "more probable than not" Respondent would reoffend with a "hands on offense" of child molestation if released.

46. Dr. Lela Demby never had a clinical interview with Respondent. Her two reports, May 4, 2007 and March 9, 2011, were consistent on diagnosis of "pedophilia, sexually attracted to males, and Schizoid Personality Disorder." The first report also found "anti-social personality disorder" under the DSM-IV-TR, the second report in 2011 did not. Dr. Demby also employed a battery of actuarial tests. Dr. Demby used the Static-99 and RRASOR in 2007 report; she also has used the Static-99R and SVR-20. Dr. Demby compiled her results from the testing and determined that the Respondent had a very high risk of "re-offending."

47. Dr. John Warren was appointed as the expert for the Respondent. Dr. Warren interviewed the Respondent and reviewed the disclosures provided by the Government. Dr. Warren found that only DSM-IV-TR as "pedophilia, exclusive to males." Dr. Warren administered one actuarial test, Static-99R, and found that this risk of offending was more than the norm of a rate of about 6.7% which is the rate for

all sex offenders. Dr. Warren testified that the use of multiple actuarial tools to predict recidivism is criticized in the psychological literature as cumulative, and not particularly helpful. Dr. Warren did administer the Static-99R and scored a six, but Dr. Warren testified and cautioned that actuarial instruments only predict the risk of the group that an individual may be assigned by the administrator of the tests. In other words, an offender's risk may not be consistent with the group rates because the instruments do not measure individual factors such as in this passage of time from 1998 and length of incarceration of Respondent. The key to the understanding of Respondent is volitional control. The diagnosis given to Respondent does not impair his volitional control. Respondent indeed has volitional control by not offending by indulging in child molestation while in the Navy, for the years after his discharge, and for the two periods when he was on state parole in California after the child molestation conviction, and while on supervised release. His choice to participate in child pornography shows volitional control; this activity, while, illegal, is not child molestation and child molestation is the heart of the Act. Respondent does exhibit evidence of remorse for the child molestation and exhibits "victim empathy." All these factors mitigate against his risk of reoffending with an offense involving child molestation.

## VII. STATEMENTS MADE BY RESPONDENT WHILE IN THERAPY

48. Respondent testified that since the age of 12 he knew that he had a sexual attraction to young males; that he did not understand the source of this attraction and he struggled with this attraction; he dealt with this attraction by pornographic material while in the Navy; after his discharge from the Navy he did not offend with an actual "illegal touching offense" until age 25; he had the one child that he molested at age 25; but this is the only one and there will never be another; after his conviction, Respondent knew that he has two issues to address - "victim empathy" and "adult attraction." Respondent sought out treatment and was referred to Atascadero Hospital for a pilot program in California. Respondent was in his mid-twenties and terribly confused; he tried to take his life after his 1988 arrest.

Respondent testifies that he was filled with anger at himself because he did not understand the sexual attraction. Respondent is an analytical person and he could not "make sense" of what he call this "stinking thinking."

49. Respondent does admit that in different therapeutic settings when he thought what he was discussing his issues with therapists in confidence he did make statements to therapists about the legality of what he was doing. Respondent was conflicted and angry and he was unsure about the wrongfulness of his actions in terms of child molestation; he did feel that he was, in a sense, prosecuted by society because he did not understand these feelings of attraction and he was ashamed and embarrassed by this part of his life and his convictions. In what he interpreted, in 1997 when entered the SOTP program at Butner as a hypothetical questions, he did say something to the effect that he would continue to molest, if this activity was moral or legal - but that was in 1997. Since that period he has been on supervised release and not reoffended with child molestation. But after his incarceration in 2001, Respondent began a period of self-help that came with age and study. Respondent did master his anger. He also found texts on perpetrators and the impact of child molestation on children. He wept for a week when the victim empathy and remorse for what he had done to the 11 year old came home to him. Respondent now has victim empathy.

50. Respondent has also developed relationships with adults. He is not considered a loner as corroborated by Dr. North's report which ruled out Schizoid personality disorder. These relationships are a source of strength for Respondent and, if released, he will nurture adult interpersonal relationships as a basis of his daily lifestyle. Respondent is at peace with himself on the issue of reoffending; he no longer fantasizes about young boys, he has no libido, he is 48 years old, and he has served 11 consecutive years in prison.

51. This Court, after hearing from the three experts and reviewing their reports and the submissions of counsel and studying carefully the demeanor of the Respondent and the testimony and

passion with which he presented same to this Court, finds that the Government has not proven by clear and convincing evidence that the third prong of the Act has been satisfied. When all the evidence is weighed out and carefully considered, the Government has not proven by clear and convincing evidence that the Respondent has a mental disorder such that he would have a serious difficulty in refraining from sexually violent conduct or child molestation, if released.

## VII. CONCLUSIONS OF LAW

52. For preservation purposes, this Court concludes that § 4248 deprives Respondent of equal protection under the Fourteenth and Fifth Amendments to the United States Constitution and deprives and deprived him of due process of law by the delay in the commitment hearing and that the civil conditions of the Respondent' pretrial confinement cause § 4248 to be, in effect, a criminal scheme of punishment which violates his criminal and statutory rights and Constitutional rights as outlined above.

53. This Court concludes that Respondent made confidential statements used in patient-psychologist settings which were protected by the law in California, the First Amendment, and *Jaffee v. Richmond, supra.* These confidential statements should not be used at this hearing nor used as the basis of opinions by Government experts, and therefore should be excluded.

54. This Court finds that in 1989 the Respondent was convicted of acts of child molestation that occurred in 1988 in the State of California, that the Respondent does meet the diagnostic criteria for "pedophilia exclusive to males," and this Court concludes that the first two prongs of the Act have been proven by clear and convincing evidence.

55. This Court finds that pedophilia does not automatically carry with it any necessary implications regarding the Respondent's level of volitional control. This Court concludes that the Government has not proven by clear and convincing evidence that the Respondent now suffers from a volitional impairment such that he would have "serious difficulty refraining from sexually violent conduct of child molestation, if released."

56. The Court finds that the conflict in the testimony of the three experts on diagnosis and the issue of volitional control raises doubt about the clear and convincing standard in this case. Dr. Demby had modified her diagnosis as has Dr. North. Both bottom their opinion on the third prong of the Act on the actuarial instruments; Dr. Demby places great weight in her opinions on the statements made by the Respondent in excess of fourteen years ago while in treatment. Dr. Warren focuses in his testimony on the limits of the DSM-IV-TR as applied to this type of hearing, to his concern about a psychologist seeking to provide opinions on issues which are really in the province of this Court, and volitional control. Dr. Warren's testimony is more believable and credible because he points out that the actuarial testing compares only part of an individual's history to a group and that the diagnosis of Pedophilia does not automatically mean that the Respondent does not have volitional control. This Court finds that the important point raised by Dr. Warren is the control that the Respondent showed before the 1988 incident and since that incident and that the Act is directed to child molestation and not the violation of the laws concerning child pornography. This Court concludes that greater weight should be given to the testimony of Dr. Warren and that Respondent does now have volitional control.

57. This Court finds that the Respondent's testimony was believable and consistent. Respondent has struggled since a preteen with this sexual attraction to young teens. The Court finds that the Respondent has expressed and still carries remorsefor his young victim from 1988 and that he is no longer a loner as he was at that time - he has developed not only an abundance of "victim empathy" but learned how to maintain adult interpersonal relationships during the last eleven years of incarceration.

58. This Court finds and concludes that the sole child molestation criminal activity occurred in 1988 - nearly a quarter of a century ago - and Respondent has not committed further offenses of child molestation when in the community on state parole or supervised release. If released, Respondent will return to supervised release under the direction of the United States Probation Office at San Diego, California.

## CONCLUSION

Based on the foregoing, the Court should enter a judgment in the matter that Mikel James Bolander is not a "sexually dangerous person" and order his release from the custody of the Bureau of Prisons so he may commence his term of supervised release.

Respectfully submitted, this the 18th day of January, 2012.

                              THE LAW OFFICES OF W. H. PARAMORE, III, P.C.

                              BY:   /s/ W. H. Paramore, III
                                    W. H. PARAMORE, III
                                    Attorney for Defendant
                                    410 New Bridge Street, Suite 4
                                    P. O. Box 215
                                    Jacksonville, NC 28540
                                    Telephone: (910) 347-1800
                                    North Carolina State Bar #7257
                                    L. R. 57.1 Counsel
                                    Appointed

**THE LAW OFFICES OF W. H. PARAMORE, III, P.C.** - Telephone: (910) 347-1800
410 New Bridge Street, Suite 4, P. O. Box 215, Jacksonville, NC 28540
19

Case 5:07-hc-02032-FL-JG Document 104 Filed 01/18/12 Page 19 of 20

CERTIFICATE OF SERVICE

The undersigned certifies and stipulates that a copy of this foregoing Motion was electronically filed consistent with Local Rule 49.2 and served on the persons listed below:

Dennis Iavorone
Clerk, U.S. District Court

United States Attorney's Office:
Edward D. Gray
edward.gray@usdoj.gov

This the 18th day of January, 2012.

THE LAW OFFICES OF W. H. PARAMORE, III, P.C.

BY: /s/ W. H. Paramore, III
 WALTER H. PARAMORE, III
 Attorney for Defendant
 410 New Bridge Street, Suite 4
 P. O. Box 215
 Jacksonville, NC 28540
 Telephone: (910) 347-1800
 North Carolina State Bar #7257
 L. R. 57.1 Counsel
 Appointed

**THE LAW OFFICES OF W. H. PARAMORE, III, P.C.** - Telephone: (910) 347-1800
410 New Bridge Street, Suite 4, P. O. Box 215, Jacksonville, NC 28540
20

Case 5:07-hc-02032-FL-JG Document 104 Filed 01/18/12 Page 20 of 20